1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

San Francisco Division

11

JOSEPH PAT CUVIELLO, individually,

Case No. 23-cv-00029-LB

12

Plaintiff,

**ORDER GRANTING MOTION TO DISMISS IN PART AND DENYING MOTION FOR PRELIMINARY INJUNCTION**

13

v.

14

CITY OF BELMONT, et al.,

Re: ECF Nos. 22, 28, 37

15

Defendants.

16
17

**INTRODUCTION**

18

    The plaintiff, who is representing himself, sued the City of Belmont and city officials (the city

19

manager and the head of the Parks and Recreation department) after they withdrew their approval of

20

his volunteer program's work removing invasive plants from the city's open spaces. He claims that

21

they did this to retaliate against him for his criticism of the city's environmental policies, in

22

violation of the First Amendment to the U.S. Constitution and his free-speech rights under the

23

California Constitution. He also claims that they ended his volunteer project without due process

24

and violated his equal-protection rights because another volunteer group comprised of mountain

25

bikers continued work on trails in the open spaces. He then moved for a preliminary injunction to

26

allow him to continue removing the plants. The defendants moved to dismiss his complaint for

27

failure to state a claim, moved to strike certain allegations in it, and opposed the preliminary

28

injunction.

United States District Court
Northern District of California

1    The court denies the motion to dismiss the retaliation claim against Brigitte Shearer (the head

2  of the Parks and Recreation department): the plaintiff plausibly pleads a prima facie case of

3  retaliation. He does not adequately plead a retaliation claim against the city or the city manager:

4  they are not vicariously liable for Ms. Shearer's conduct, and the complaint's allegations do not

5  establish their independent liability. The plaintiff does not plausibly plead due-process claims

6  because he has no property or liberty interest in being a volunteer. He did not plausibly plead an

7  equal-protection claim because he did not allege sufficiently that the defendants treated him

8  differently than other similarly situated persons. And he did not plausibly plead that his

9  volunteerism is symbolic conduct entitled to protection under the First Amendment.

10    The court denies the defendants' motion to strike as immaterial allegations about mountain

11  bikers, lack of acknowledgment of the plaintiff's efforts, and the invasive plants. These allegations

12  at least possibly have a bearing on the claim here. The court denies the plaintiff's motion for a

13  preliminary injunction because he has not satisfied the *Winter* factors.

14

15                                          **STATEMENT**

16  **1. The Complaint's Allegations and Claims**

17    The plaintiff and his wife are environmentalists and animal-rights advocates who work

18  together as advocates and live in Belmont, California, near a preserve called the Waterdog Open

19  Space.[1] The plaintiff (in 2020) and his wife (in 2018) both ran unsuccessful campaigns for city

20  council against current elected officials but were not elected.[2] They cofounded a volunteer group

21  called Friends of Waterdog Open Space to protect the ecological health of Belmont's open space.

22  "Through Friends of Waterdog," the plaintiff "began utilizing DEFENDANT City's General Plan

23  open space action program by volunteering to remove invasive plant species, such as French

24  broom," in the Waterdog Open Space and areas outside of the space. He "would like to expand his

25

26  _____

[1] First Am. Compl. (FAC) – ECF No. 7 at 2 (¶ 3), 9 (¶¶ 31–32). Citations refer to material in the
27  Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of
documents.

28  [2] *Id.* at 11 (¶ 40), 15 (¶ 55).

1    volunteer efforts to include more public lands in the City of Belmont and beyond."[3]

2        From January 2021 to June 2021, Friends of Waterdog (primarily through the plaintiff's work)

3    spent 160.5 hours removing invasive plant species (primarily French broom but also pampas

4    grass). Belmont's Parks and Recreation department organized volunteers to move the piles of

5    plants out of the open space, which involved 40 to 80 volunteer hours.[4] The plaintiff and Friends

6    of Waterdog spent more time in 2022 removing invasive plants: 242 hours from January through

7    April 2022.[5] In January 2022, the plaintiff asked defendant Brigitte Shearer, who is the director of

8    the Parks and Recreation department, for permission to remove an evasive species called Echium

9    Candicans. In October, he asked for an update about his request, and on November 21, 2022, Ms.

10   Shearer told him not to remove any more plants. He asked for an explanation and was not given

11   any. He asked whether the directive included French broom and pampas grass, and on December

12   6, Ms. Shearer said that he was not to remove any invasive plants from the Open Space.[6]

13       The plaintiff alleges that the defendants did this in retaliation for his protected activities.[7] The

14   defendants are the City of Belmont, the city manager Afshin Oskoui, and Ms. Shearer.[8] The

15   complaint is thirty-seven pages long and lists many activities, interactions, and contexts for the

16   suspension of his volunteer activities. This is a non-exhaustive summary.

17       The Waterdog Open Space is biologically rich and needs preservation. The city owns and

18   manages the preserve, has a master plan for it, and does not enforce some aspects of it (such as

19   mountain bikers riding on single-use trails).[9] Since 2018, the plaintiff and his wife have been

20   vocal critics of the city's practices, especially about unrestricted mountain biking in the Waterdog

21   Open Space.[10] They advocate on social media and at public government meetings for

22

23   [3] *Id.* at 4–5 (¶ 16).

24   [4] *Id.* at 15–16 (¶ 57).

     [5] *Id.* at 19 (¶ 69).

25   [6] *Id.* at 26–27 (¶ 90).

26   [7] *Id.* at 1 (¶ 1).

     [8] *Id.* at 2 (¶¶ 4–6).

27   [9] *Id.* at 5–6 (¶¶ 18–20).

28   [10] *Id.* at 5 (¶ 18), 6–7 (¶ 22), 10 (¶ 35).

United States District Court
Northern District of California

environmental protection and against unrestricted mountain biking.[11] They have submitted Public Records Act requests about the city's and Ms. Shearer's management of the Open Space and their communications with his group.[12] The plaintiff's wife sued the city because it withheld documents showing that the city intentionally kept environmentalists off the Parks, Recreation, and Open Space Master Plan committee. In the settlement, the city paid her attorney's fees of $56,000.[13]

The plaintiff and other residents approached the city about enforcing the master plan and closing illegally built trails that mountain bikers used to connect trails.[14] The mountain bikers have their own volunteer group called Waterdog Trailkeepers and want unrestricted access and trails. The city supports their vision, not the plaintiff's group's vision.[15]

In 2019, the plaintiff and others successfully opposed the city's plan to build a bike pump track in Waterdog Open Space.[16] In June 2020, he submitted a work proposal to Ms. Shearer through his volunteer group, asking to remove berms and jumps built by mountain bikers, close some unauthorized trails, and remove French broom. The city gave him approval to remove the plants, and the Parks and Recreation Department removed the jumps and closed the trails (but did not remove the berms).[17] In October 2020, the plaintiff wrote a report, posted it online, and sent it to city officials: the report was about the environmental impact of mountain biking in Waterdog Open Space. He updated and resubmitted it in July 2022. No one followed up with him.[18] In October 2020, through his volunteer group, he submitted a proposal to close four unauthorized trails and to revegetate the area, but Ms. Shearer approved only one closure that required only the installation of a "Not a Trail" sign.[19] He commissioned an environmental analysis in May 2021 and gave it to the

---

[11] *Id.* at 7 (¶ 23).

[12] *Id.* (¶ 24).

[13] *Id.* at 7 (¶ 24), 24 (¶ 83).

[14] *Id.* at 11 (¶ 39).

[15] *Id.* at 6 (¶ 21).

[16] *Id.* at 11 (¶ 41).

[17] *Id.* at 14 (¶ 49).

[18] *Id.* at 14–15 (¶¶ 50–53).

[19] *Id.* at 15 (¶ 54).

city. The city did its own analysis to counter his.[20] He submitted another report in September 2021.[21] Starting in 2022, he attended every Parks and Recreation Open Space meeting to follow the master-plan process. Ms. Shearer attended too. He was vocal about protecting the environment, critical of the city's analysis, and provided data to support his view. The Parks and Recreation Commission recommended its plan for approval to the city without serious review.[22] The city council was expected to fast track the plan, but the plaintiff's wife hired an environmental law firm and threatened to sue the city if it approved the plan without conducting an environmental review. On July 22, 2022, the city council placed the plan on hold pending further environmental review.[23]

The plaintiff and his wife monitor the Open Space entrances at night and report illegal bikers to the police, who say that they cannot act unless they catch bikers in the act.[24]

In sum, the plaintiff alleges that the city suspended his volunteer program in 2022 as retaliation for his wife's and his public criticism of the city.[25]

The complaint has the two claims: (1) a violation of the plaintiff's rights to free speech, equal protection of the laws, and due process, in violation of the First and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983, and (2) a violation of his free-speech rights under the California Constitution, Art. 1, § 2(a).[26]

## 2.   Additional Evidence for the Preliminary Injunction

The Waterdog Open Space is 260 acres and 10.5 miles of mapped and unmapped trails.[27] The city uses volunteers to help with trail maintenance and invasive-plant removal.[28] Two volunteer

---

[20] *Id.* at 17 (¶¶ 61–62).

[21] *Id.* at 18 (¶ 64).

[22] *Id.* at 20–21 (¶¶ 74–76).

[23] *Id.* at 22 (¶ 78).

[24] *Id.* at 22–23 (¶¶ 79–81).

[25] *Id.* at 32 (¶¶ 105–07).

[26] *Id.* at 34–36 (¶¶ 119–28).

[27] Shearer Decl. – ECF No. 30-1 at 2 (¶ 3).

[28] *Id.* at 2–3 (¶ 5).

groups work there: the plaintiff's group and the Waterdog Trailkeepers.[29]

In 2020, the plaintiff contacted Ms. Shearer with a proposal to remove non-native plant species, she agreed, and he began removing plants in the summer 2020.[30] They "were in general agreement about the scope of his volunteer activities in the Waterdog Open Space."[31] They communicated occasionally by email or in person about when he intended to work, where, and the location of piles of vegetation to be removed by the city. Ms. Shearer gave him signage to post when he was volunteering to show others that the city authorized his activity. She also gave him a plant-removal tool and helped plan at least two volunteer groups with him.[32]

In November 2022, she emailed him: "let's hold off with any plant removal at this time." She told the Waterdog Trailkeepers to hold off too.[33] She did this because her department needed time "to consult with its environmental consultants regarding removal of non-native plant species and trail maintenance in the Waterdog Open Space. The Department was concerned about potential safety issues presented by the volunteer activities and needed time to assess best practices in management of these sorts of volunteer activities" in the city's open space.[34] She understood that the volunteer activities could resume after the city "had time to consider any assessment and/or recommendations from its consultants regarding safety and management of volunteer activities."[35] She denies any retaliation based on the plaintiff's and wife's criticism of the city.[36]

The plaintiff points out that the court must accept his allegations for the motion to dismiss as true: the suspension is permanent, the defendants never communicated with him, they took down all of his volunteer flyers from city-owned Open Space boards, and they left the Waterdog

---

[29] *Id.* at 3 (¶ 6).

[30] *Id.* at 3 (¶¶ 7–9).

[31] *Id.* (¶ 8).

[32] *Id.* (¶ 9).

[33] *Id.* at 3–4 (¶ 10).

[34] *Id.* at 4 (¶ 11).

[35] *Id.* (¶ 12).

[36] *Id.* (¶ 13).

Trailkeepers' flyers on display.[37]

The city is in the process of developing a new Parks, Recreation, and Open Space Master Plan. It began preparing the plan in February 2021. The plan is a strategic planning document. The process includes assessments by environmental consultants and landscape architects of the existing parks, open spaces, and outdoor-recreation facilities. When it is finished, it will allow the city to respond to new opportunities and ensure that adequate parks, open space, and outdoor recreation facilities meet the needs of the city, its residents and employees, and visitors.[38]

The plaintiff submitted documents from his March 13, 2023, public-records request and points out that there is nothing in them about safety issues for volunteers.[39]

## 3. Procedural History

The court held a hearing on the plaintiff's preliminary injunction. The court has federal-question jurisdiction over the federal constitutional claims and supplemental jurisdiction over the state constitutional claim. 28 U.S.C. §§ 1331, 1367(a). All parties consented to magistrate jurisdiction.[40] *Id.* § 636(c).

### STANDARDS OF REVIEW

## 1. Rule 12(b)(6) Motion to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of (1) what the claims are and (2) the grounds upon which they rest. Fed. R. Civ. P. 8(a)(2); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank*

---

[37] Opp'n – ECF No. 35 at 9 (citing among other paragraphs FAC – ECF No. 7 at 28 (¶ 95)).

[38] Shearer Decl. – ECF No. 30-1 at 2 (¶ 4).

[39] Submission – ECF No. 37; Exs. A–E to Cuviello Decl. – ECF No. 37-1. The court grants the plaintiff's unopposed requests for judicial notice at ECF Nos. 22-6 and 35-1 and considers them either under the incorporation-by-reference doctrine or because they are public records that the court can judicially notice. Fed. R. Evid. 201; *Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (public records generally).

[40] Consents – ECF Nos. 11, 17.

1    *N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016).

2        A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide

3    the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a

4    formulaic recitation of the elements of a cause of action will not do. Factual allegations must be

5    enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (cleaned

6    up). A complaint must contain factual allegations that, when accepted as true, are sufficient to

7    "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);

8    *NorthBay Healthcare Grp., Inc. v. Kaiser Found. Health Plan, Inc.*, 838 F. App'x 231, 234 (9th

9    Cir. 2020). "[O]nly the *claim* needs to be plausible, and not the facts themselves. . . ." *NorthBay*,

10   838 F. App'x at 234 (citing *Iqbal*, 556 U.S. at 696); *see Interpipe Contracting, Inc. v. Becerra*,

11   898 F.3d 879, 886–87 (9th Cir. 2018) (the court must accept the factual allegations in the

12   complaint "as true and construe them in the light most favorable to the plaintiff") (cleaned up).

13       Put another way, "[a] claim has facial plausibility when the plaintiff pleads factual content that

14   allows the court to draw the reasonable inference that the defendant is liable for the misconduct

15   alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability

16   requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

17   *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops

18   short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (cleaned up).

19       If a court dismisses a complaint because of insufficient factual allegations, it should give leave

20   to amend unless "the pleading could not possibly be cured by the allegation of other facts." *Cook,*

21   *Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990). If a court

22   dismisses a complaint because its legal theory is not cognizable, the court should not give leave to

23   amend. *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016); *see*

24   *Steele-Klein v. Int'l Bhd. of Teamsters, Loc. 117*, 696 F. App'x 200, 202 (9th Cir. 2017) (leave to

25   amend may be appropriate if the plaintiff "identifie[s] how she would articulate a cognizable legal

26   theory if given the opportunity").

27       Federal courts must construe pro se complaints liberally. *Hughes v. Rowe*, 449 U.S. 5, 9

28   (1980); *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005). A pro se plaintiff need only

United States District Court
Northern District of California

provide defendants with fair notice of his claims and the grounds upon which they rest. *Hearns*,
413 F.3d at 1043. He need not plead specific legal theories so long as sufficient factual averments
show that he may be entitled to some relief. *Id.* at 1041.

### 2.   Rule 12(f) Motion to Strike

Motions to strike are governed by Rule 12(f) of the Federal Rules of Civil Procedure. That rule
provides: "The court may strike from a pleading . . . any redundant, immaterial, impertinent, or
scandalous matter." Fed. R. Civ. P. 12(f). "The function of a [Rule 12(f)] motion to strike is to avoid
the unnecessary expenditures that arise throughout litigation by dispensing of any spurious issues
prior to trial." *Rosales v. FitFlop USA, LLC*, 882 F. Supp. 2d 1168, 1178 (S.D. Cal. 2012) (citing
*Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir. 1983)). Striking is appropriate if it
"will make trial less complicated or eliminate serious risks of prejudice to the moving party, delay,
or confusion of the issues." *Sliger v. Prospect Mortg.*, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2011).

"Immateriality" and "impertinence" under Rule 12(f) both speak to the relevance of
challenged allegations. "'Immaterial' matter is that which has no essential or important
relationship to the claim for relief or the defenses being pleaded." *Fantasy, Inc. v. Fogerty*, 984
F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds,* 510 U.S. 517 (1994) (cleaned up).
"'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues
in question." *Id.* Where a movant challenges allegations as immaterial or impertinent, "[a] court
must deny the motion to strike if there is any doubt whether the allegations in the pleadings might
be relevant in the action." *Oracle Am., Inc. v. Micron Tech., Inc.*, 817 F. Supp. 2d 1128, 1132
(N.D. Cal. 2011). "[G]enerally," then, courts grant such a motion "only where 'it is clear that the
matter to be stricken could have no possible bearing on the subject matter of the litigation.'"
*Rosales*, 882 F. Supp. 2d at 1179 (quoting *Walters v. Fid. Mortg. of Cal.*, 730 F. Supp. 2d 1185,
1196 (E.D. Cal. 2010) (citing in turn *Lilley v. Charren,* 936 F. Supp. 708, 713 (N.D. Cal. 1996)).

"Even where matter in a pleading is relevant to the controversy, it nonetheless may be stricken
if it is scandalous or set out in 'needless detail.'" *Tucker v. Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1,
16 (D. Conn. 2013) (quoting *Cabble v. Rollieson*, No. 04CIV9413LTSFM, 2006 WL 464078,

1    at *11 (S.D.N.Y. Feb. 27, 2006) and citing authorities). "Scandalous" under Rule 12(f) "generally

2    refers to any allegation that unnecessarily reflects on the moral character of an individual or states

3    anything in repulsive language that detracts from the dignity of the court." *Anderson v. Davis Polk*

4    *& Wardwell LLP*, 850 F. Supp. 2d 392, 416 (S.D.N.Y. 2012) (quoting 2 J. Moore *et al.*, *Moore's*

5    *Federal Practice* ¶ 12.37[3] (3d ed. 2010)). "Scandalous" has also been said to encompass

6    allegations that "improperly cast a derogatory light on someone." *Asher & Simons, P.A. v. j2*

7    *Global Canada, Inc.*, 965 F. Supp. 2d 701, 704 (D. Md. 2013) (quoting 5C C. Wright *et al.*,

8    *Federal Practice and Procedure* § 1382 (3d ed. 2011)).

9        "As a rule, motions to strike are regarded with disfavor because striking is such a drastic

10   remedy; as a result, such motions are infrequently granted." *Amini Innovations Corp. v. McFerran*

11   *Home Furnishings, Inc.*, 301 F.R.D. 487, 489–90 (C.D. Cal. 2014) (citing *Freeman v. ABC Legal*

12   *Servs., Inc.*, 877 F. Supp. 2d 919, 923 (N.D. Cal. 2012) (citing in turn *Stanbury Law Firm v. IRS*,

13   221 F.3d 1059, 1063 (8th Cir. 2000)). "[W]hen ruling on a motion to strike," the court accepts the

14   challenged allegations as true and "must liberally construe" those allegations "in the light most

15   favorable" to the non-moving pleader. *Stearns v. Select Comfort Retail Corp.*, 763 F. Supp. 2d

16   1128, 1140 (N.D. Cal. 2010); *see, e.g., Multimedia Patent Trust v. Microsoft Corp.*, 525 F. Supp.

17   2d 1200, 1211 (S.D. Cal. 2007) ("In determining a motion to strike, a district court must view the

18   pleadings in the light most favorable to the pleader.").

19

20   **3.    Preliminary-Injunction Standard**

21       The standards for a TRO and a preliminary injunction are the same. *Stuhlbarg Int'l Sales Co.*

22   *v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A movant must demonstrate

23   (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm that would result if

24   an injunction were not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an

25   injunction is in the public interest. *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). The irreparable

26   injury must be both likely and immediate. *Id.* at 20–22. "[A] plaintiff must demonstrate immediate

27   threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co.*

28   *v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). Two elements — the balance of equities and

United States District Court
Northern District of California

1    whether an injunction is in the public interest — merge where the government is a party.

2    *California v. Azar,* 911 F.3d 558, 575 (9th Cir. 2018).

3       Before *Winter*, the Ninth Circuit employed a "sliding scale" test that allowed a plaintiff to

4    prove either "(1) a likelihood of success on the merits and the possibility of irreparable injury; or

5    (2) serious questions going to the merits were raised and the balance of hardships tips sharply in

6    its favor." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999) (cleaned up). On this

7    continuum, "the greater the relative hardship to [a movant], the less probability of success must be

8    shown." *Id.* After *Winter*, the Ninth Circuit held that although the Supreme Court invalidated one

9    aspect of the sliding scale approach, the "serious questions" prong of the sliding scale survived if

10    the plaintiff satisfied the other elements for preliminary relief. *All. for Wild Rockies v. Cottrell*,

11    632 F.3d 1127, 1131–32 (9th Cir. 2011). Thus, a preliminary injunction may be appropriate when

12    a movant raises "serious questions going to the merits" of the case and the "balance of hardships

13    tips sharply in the plaintiff's favor," provided that the other elements for relief are satisfied. *Id.* at

14    1134–35.

15                         **ANALYSIS**

16   **1. Due Process — Property Right — Fourteenth Amendment (Claim One)**

17       The plaintiff claims that he has a protectible property right under state law to volunteer, and

18    that the defendants deprived him of that right without procedural due process.[41] The plaintiff does

19    not have a property right to volunteer.

20       The Due Process Clause of the Fourteenth Amendment protects individuals against

21    governmental deprivations of "life, liberty or property" without due process of law. *Bd. of Regents*

22    *v. Roth*, 408 U.S. 564, 570–71 (1972); *Mullins v. Oregon*, 57 F.3d 789, 795 (9th Cir. 1995). "To

23    prevail on a claim for a procedural due process violation, the party must prove three elements: 1) a

24    protectable liberty or property interest, 2) government deprivation of that interest, and 3) a denial of

25    adequate procedural protections." *Holman v. City of Warrenton*, 242 F. Supp. 2d 791, 803 (D. Or.

26    2002) (citing *Foss v. Nat'l Marine Fisheries Serv.*, 161 F.3d 584, 588 (9th Cir. 1998)).

27

28    [41] FAC – ECF No. 7 at 34–35 (¶¶ 120, 122–23).

United States District Court
Northern District of California

1     Property interests that are procedurally protected by the Due Process Clause may arise from

2  two sources: the Due Process Clause itself and laws of the states. *Meachum v. Fano*, 427 U.S. 215,

3  223–27 (1976). Property includes traditional notions of property (such as ownership and

4  possessory interests) and statutory or regulatory entitlements that arise from the existence of

5  objective standards for government-dispensed commodities (such as objective standards for public

6  employment, social-security-benefits, or a driver's license). *Cleveland Bd. Of Educ. v. Loudermill*,

7  470 U.S. 532 (1985) (public employment); *Mathews v. Eldridge*, 424 U.S. 319 (1976) (social-

8  security benefits); *Bell v. Burson*, 402 U.S. 535 (1971) (driver's license); *Goldberg v. Kelly*, 397

9  U.S. 254 (1965) (public assistance); *Roth v. Veterans' Admin.*, 856 F.2d 1401, 1409 (9th Cir.

10  1988) ("Entitlements arise from rules or understandings from independent sources, such as

11  statutes, regulations, and ordinances, or express or implied contracts.") (cleaned up), *overruled on*

12  *other grounds by Garcetti v. Ceballos*, 547 U.S. 410, (2006). The objective standards create a

13  reasonable expectation that if the standards are satisfied, then the government will provide the

14  benefit. Discretionary standards, by contrast, do not create a reasonable expectation of entitlement.

15  *See* Martin A. Schwartz, Section 1983 Litigation Claims and Defenses vol. 1 § 3.05[B] 3-57 (4th

16  ed. 2019 Supp.) (collecting cases).

17     The plaintiff relies on Government Code sections that require the city to adopt an open-space

18  element as part of its general plan and to implement an "action program."[42] Then, he points to the

19  city's general plan's provision to "[e]ncourage volunteers to maintain the trails, replant damaged

20  areas, and remove invasive species."[43] These are not the objective standards that create a

21  reasonable expectation that the plaintiff is entitled to volunteer.

22     *Hyland v. Wonder* addressed a volunteer's entitlement to a position with the San Francisco

23  Juvenile Probation Department. 972 F.2d 1129, 1132 (9th Cir. 1992). After a 1964 conviction for

24  armed robbery, the plaintiff served his sentence and began work in May 1987 as a volunteer

United States District Court
Northern District of California

---

[42] *Id.* at 34–35 (¶ 120) (citing Cal. Gov't Code § 65562); Opp'n – ECF No. 35 at 16 (citing Cal. Gov't Code §§ 56302(e) & 65560–67).

[43] Opp'n – ECF No. 35 at 16; Belmont General Plan, Ex. E to Req. for Jud. Notice – ECF No. 35-1 at 22–23.

assistant to the Chief Probation Officer with the goal of becoming a probation officer. At the beginning of his service, the Chief promised the plaintiff that he could continue as a volunteer until he received a state pardon, which would allow him to be hired for a paid position. *Id.* A new director of Juvenile Hall started in 1988, and conditions deteriorated substantially: escapes and assaults were up, and the California Youth Authority threatened to sue if conditions did not improve. *Id.* at 1133. Frustrated, the plaintiff wrote a letter in February 1989 to three judges: the presiding judge of the San Francisco Superior Court, the supervising judge of the Juvenile Court, and the former supervising judge. Before he sent it, he showed it to the Chief Probation Officer, who ended his volunteer job on the spot and banned him from ever entering Juvenile Hall again. *Id.* This meant that during his later job as a paid consultant with a national nonprofit, he could not work on cases in San Francisco Juvenile Court. *Id.* The Chief and director withdrew their support for his pardon. *Id.* (recounting other post-firing acts). The plaintiff sued on the ground that his termination was impermissible retaliation for protected speech, in violation of the First and Fourteenth Amendments. *Id.* at 1132. The district court dismissed the claims under Rule 12(b)(6). *Id.* The Ninth Circuit reversed on the First Amendment retaliation claim but affirmed the dismissal of the Fourteenth Amendment due-process claim. *Id.* at 1134, 1140.

In analyzing the due-process claim (the relevant issue here), the Ninth Circuit held that the plaintiff had no constitutionally cognizable property interest in the perpetuation of his volunteer status. *Id.* at 1140. The basis for his continued volunteer status was an oral promise. This was not a legal entitlement for two reasons. One, an agreement must be mutually explicit, and this agreement was not because the plaintiff did not allege that their agreement was an explicit promise not to terminate him. Two, even if there were an explicit promise that the volunteer position could be terminated only when the plaintiff received a pardon, that promise was void as contrary to law: under California law, the terms of government service are regulated by statute, not contract; county civil-service laws defined the tenure of probation employees; and temporary non-civil-service employees have no property interest in continued employment. *Id.* at 1140–41 (citing Cal. Welf. & Inst. Code § 271 (defining tenure of probation employees); *Williams v. Los Angeles City Dep't of Water & Power*, 130 Cal. App. 3d 677, 680 (1982) (no property interest for temporary

1   non-civil-service employees)). The analysis applied to the plaintiff's status as a volunteer: he had

2   no protectible property interest. *Id.* at 1141.

3       *Hyland* suggests the same conclusion here, assuming that the analysis is similar for municipal

4   workers. Even if it is not, the Government Code sections and the city plan do not have objective

5   standards or criteria that create a reasonable expectation that if the standards are satisfied, then there

6   is an entitlement to the benefit. The plaintiff thus did not plausibly plead a claim.

7

8   **2.  Due Process — Liberty Interest — Fourteenth Amendment (Claim One)**

9       The plaintiff also contends that he has a protectible liberty interest in acquiring useful

10  knowledge through volunteering.[44] He does not plead a plausible claim.

11      The Due Process Clause protects individuals against governmental deprivations of liberty

12  without due process of law. *Roth*, 408 U.S. at 570–71. Unlike property interests, which are defined

13  by reference to state law, liberty has constitutional and state-law components.

14      The constitutional component includes freedom from physical restraint, the right to marry and

15  have children, and the right to pursue a trade or profession. *See* Martin A. Schwartz, Section 1983

16  Litigation Claims and Defenses vol. 1 § 3.05[C] 3-86.1 (4th ed. 2016 Supp.) (collecting cases).

17      For a state law to create a protected liberty interest, it must have mandatory substantive

18  predicates: "the use of explicit mandatory language, in connection with the establishment of

19  specified substantive predicates to limit discretion, forces a conclusion that the state has created a

20  liberty interest." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 463 (1989) (cleaned up). This

21  comes up in the prisoner context. For example, state law triggers procedural due-process

22  protections if it requires that administrative segregation cannot be imposed "absent specified

23  substantive predicates." *Hewitt v. Helms*, 459 U.S. 460, 471–72 (1983).[45]

24

25

26  ───────────────
    [44] FAC – ECF No. 7 at 30–31 (¶¶ 100–02), 34–35 (¶ 120); Opp'n – ECF No. 35 at 17–18.

27  [45] In the prison context, changes in conditions that are so severe that they affect the sentence in an unexpected manner can implicate the Due Process clause itself, whether or not they are authorized by state law. *Sandin v. Conner*, 515 U.S. 472, 484 (1995) (transfer to mental hospital); *Washington v.*

28  *Harper*, 494 U.S. 210, 221–22 (1990) (involuntary administration of psychotropic drugs).

The plaintiff cites *Roth* to support his claim of a protectible liberty interest.[46] The plaintiff there was hired as a professor for one year. He was not rehired and was given no explanation or opportunity to challenge the decision in a hearing. He had no tenure rights because under Wisconsin law, tenure for state university teachers accrued only after four years. Thereafter, a teacher was entitled to continued employment "during efficiency and good behavior." A new teacher without tenure was entitled to nothing beyond the one-year employment. No statutory or administrative standards defined eligibility for reemployment. State law thus left the decision whether to rehire a nontenured teacher to the unfettered discretion of university officials. *Roth*, 408 U.S. at 566–68.

The *Roth* plaintiff sued in part on the ground that the failure to give notice of the reasons for nonretention and an opportunity for a hearing violated his right to procedural due process. *Id.* at 569. The Court held that the state's decision not to rehire the plaintiff did not implicate his liberty interests. *Id.* at 573. "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." *Id.* at 575.

That analysis drives the outcome here. The plaintiff can gain useful experiences through work or other volunteer opportunities. No circumstances — like those outlined in *Roth*, *id.* at 573 — suggest that any liberty interest is implicated. There is no plausible claim. *Cf. Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (prohibition on teaching foreign languages interfered with the students' liberty interest in acquiring useful knowledge).

### 3.  Equal Protection — Fourteenth Amendment (Claim One)

The plaintiff contends that the defendants treated him differently than the Waterdog Trailkeepers: Ms. Shearer suspended him permanently, never responded to him when he asked why, took down his flyers and kept the Waterdog Trailkeepers' flyers on display, and cancelled his volunteer program and no others.[47] The court dismisses the claim (with leave to amend) because the plaintiff has not alleged that he was treated differently than others similarly situated.

---

[46] Opp'n – ECF No. 35 at 17 (citing *Roth*, 408 U.S. at 572).

[47] FAC – ECF No. 7 at 28 (¶ 95), 35–36 (¶ 125).

1      "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall

2  deny to any person within its jurisdiction the equal protection of the laws, which is essentially a

3  direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne*

4  *Living Ctr.*, 473 U.S. 432, 439 (1985) (cleaned up); *see Plyler v. Doe*, 457 U.S. 202, 216 (1982);

5  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1168 (9th Cir. 2005) (evidence of different

6  treatment of unlike groups does not support an equal-protection claim).

7      Where prisoners are not involved, the Supreme Court has articulated three distinct standards

8  applicable to equal-protection analysis: strict scrutiny, heightened scrutiny, and rational-basis

9  review. *City of Cleburne*, 473 U.S. at 440–41. The standard depends on the nature of the class

10  involved or the interest affected.

11      The most lenient standard, rational-basis review, requires only that a rational basis exist for the

12  classifications drawn and that the practice in question be adopted in pursuit of legitimate

13  government purposes. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 54–55 (1973) (right

14  to education); *Franceschi v. Yee*, 887 F.3d 927, 940 (9th Cir. 2018) (revocation of a driver's

15  license — that neither proceeds along suspect lines nor infringes constitutional rights — is subject

16  to rational-basis review).

17      At the other extreme, the strict-scrutiny standard requires a close connection between the

18  legislation or practice under examination and a compelling state interest. This is the appropriate

19  test when fundamental rights are at stake or a suspect classification is involved. *See, e.g.*, *Shapiro*

20  *v. Thompson*, 394 U.S. 618 (1969) (right to travel); *Loving v. Virginia*, 388 U.S. 1 (1967) (right to

21  marry); *see also Palmore v. Sidoti*, 466 U.S. 429, 432 (1984) (Equal Protection Clause strives "to

22  do away with all governmentally imposed discrimination based on race").

23      Finally, in between these two positions lies an intermediate standard of review, heightened

24  scrutiny: there must be a substantial relationship to an important, although not compelling, state

25  interest. This standard has been applied to gender-based classifications. *See, e.g.*, *Califano v.*

26  *Goldfarb*, 430 U.S. 199 (1977); *Craig v. Boren*, 429 U.S. 190 (1976).

27      The standard here is rational-basis review.

28      "When an equal protection claim is premised on unique treatment rather than on a

United States District Court
Northern District of California

1    classification, the Supreme Court has described it as a 'class of one claim.'" *N. Pacifica LLC v.*

2    *City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008) (citing *Vill. of Willowbrook v. Olech*, 528 U.S.

3    562, 564 (2000) (per curiam)). Thus, where state action does not implicate a fundamental right or

4    a suspect classification, the plaintiff can establish an equal-protection "class of one" claim by

5    demonstrating that the state actor (1) intentionally (2) treated him differently than other similarly

6    situated persons (3) without a rational basis. *Id.*; *Gerhart v. Lake Cnty.*, 637 F.3d 1013, 1021–22

7    (9th Cir. 2011) (citing *Willowbrook*, 528 U.S. at 564).

8        A "class of one" plaintiff must allege that he is "similarly situated to the proposed comparator

9    in all material respects." *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1123 (9th Cir. 2022).

10   For example, comparators have been held to be "similarly situated" where their interests

11   concerned the "same neighborhood block; [the] same type of property; [the] same city water line

12   (*Olech*); [or the] same type of road approach (*Gerhart*)." *Id.*

13       The intent element does not require that the government actors acted with "subjective ill will"

14   towards the plaintiff, but merely that they intended to treat the plaintiff differently. *Gerhart*, 637

15   F.3d at 1022 (citing *Willowbrook*, 528 U.S. at 565); *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d

16   936, 945–46 (9th Cir. 2004) (a plaintiff may pursue a "class of one" claim by raising a triable

17   issue of fact as to whether the defendants' asserted rational basis was merely a pretext for

18   differential treatment), *overruled on other grounds*, *Action Apartment Ass'n v. Santa Monica Rent*

19   *Control Bd.*, 509 F.3d 1020, 1025 (9th Cir. 2007). Similarly, the rational basis must exist, not for

20   the government's underlying action, but for treating the plaintiff differently. *Gerhart*, 637 F.3d at

21   1023 (rational basis for denial of permit not relevant; there must also be rational basis for denying

22   permit to plaintiff but not to other similarly situated property owners).

23       Some governmental actions are by their nature discretionary and involve a "vast array of

24   subjective, individualized assessments." *Engquist v. Or. Dep't of Agr.*, 553 U.S. 591, 603 (2008).

25   In such cases, it is not a violation of equal protection when one person is treated differently from

26   another, because doing so is an accepted consequence of the discretion granted. *Id.*

27       Here, the plaintiff's "class of one" claim is premised on the defendants' treatment of his

28   volunteer group, which is focused on removing invasive plants and illegal trails, compared to their

United States District Court
Northern District of California

1   treatment of the mountain bikers' trail-restoration group, the Waterdog Trailkeepers.[48] Based on

2   the allegations in the complaint, the volunteer groups are materially different, because only the

3   plaintiff's removes invasive plants. (The issue might alternatively be framed as the defendants'

4   having a rational basis to treat a group involved in invasive-plant removal differently from a group

5   not so involved.) The plaintiff thus has not plausibly pleaded an equal-protection claim.

6   *SmileDirectClub*, 31 F.4th at 1123; s*ee Doe v. Pasadena Unified Sch. Dist*, No. CV 18-905 PA

7   (FFMx), 2018 WL 5880187, at *4 (C.D. Cal. Sept. 26, 2018) (granting summary judgment to

8   school district on equal-protection claim brought by classroom volunteers who alleged differential

9   treatment based on their perceived national original and immigration status, because there was no

10  evidence that they were treated differently because of their perceived immigration status or

11  national origin).

12

13  **4.  Retaliation — First Amendment (Claim One)**

14      The plaintiff claims that the defendants took away his volunteer program to retaliate against

15  him for his criticism of the city. The defendants move to dismiss on the ground that there are no

16  facts stating claims against any defendants, and the individual defendants have qualified

17  immunity.[49] There are no real allegations about Mr. Oskoui or the city, so the court dismisses the

18  claims against them. But the plaintiff alleges a sufficient proximity in time between his protected

19  activity and Ms. Shearer's discontinuing his volunteer program to plausibly plead retaliation.

20      Retaliation by a state actor for the exercise of a constitutional right is actionable under 42 U.S.C.

21  § 1983, even if the act, when taken for different reasons, would have been proper. *Mt. Healthy City*

22  *Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84 (1977). Retaliation, though it is not

23  expressly referred to in the Constitution, is actionable because retaliatory actions may tend to chill

24  individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Thus,

25  a claim may be stated under § 1983 where a plaintiff alleges retaliation by state actors for the

26

27  ───────────────
    [48] FAC – ECF No. 7 at 6 (¶ 21); Opp'n – ECF No. 35 at 19 (applying "class of one" standard).

28  [49] Mot. – ECF No. 28 at 19–22.

United States District Court
Northern District of California

exercise of his First Amendment rights. *Mt. Healthy*, 429 U.S. at 283–84. The plaintiff must show that the type of activity he was engaged in was protected by the First Amendment and that the protected conduct was a substantial or motivating factor for the alleged retaliatory acts. *Id.* at 287. Filing complaints and speaking out about government officials are protected conduct under the First Amendment. *Sampson v. Cnty. of Los Angeles*, 974 F.3d 1012, 1020–21 (9th Cir. 2020).

To state a claim for First Amendment retaliation against a government official, a plaintiff must allege that (1) he engaged in constitutionally protected activity, (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action. *Mulligan v. Nichols*, 835 F.3d 983, 988 (9th Cir. 2016).

### 4.1 Claim Against Ms. Shearer

The main argument that the defendants advance is that the plaintiff has not established a causal connection between a retaliatory animus attributable to Ms. Shearer and his subsequent injury.

A plaintiff must show a causal connection between a defendant's retaliatory animus and subsequent injury in any sort of retaliation action. *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019); *Hartman v. Moore*, 547 U.S. 250, 259 (2006). In the context of summary judgment, the Ninth Circuit has held that in order to create a genuine issue of material fact on retaliatory motive in the First Amendment context, a plaintiff must establish, "in addition to evidence that the defendant knew of the protected speech, at least (1) evidence of proximity in time between the protected speech and the allegedly retaliatory decision, (2) evidence that the defendant expressed opposition to the speech[,] or (3) evidence that the defendant's proffered reason for the adverse action was false or pretextual." *Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009) (cleaned up).

The plaintiff has pleaded proximity: from his complaint, he has been relentless in his advocacy, Ms. Shearer has been at meetings with him, he sent her his reports, it is her department's master plan and policies that he takes issue with, and she ended his participation in the program summarily and without explanation in the midst of his tangling with the city and the development of the master plan. To plead a prima facie case of retaliation, the plaintiff need only make a minimal threshold

1    showing of retaliation. *Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012). The plaintiff has

2    at least made a prima facie case of retaliatory harm. *Hartman*, 547 U.S. at 260 (analyzing the issue

3    through the burden-shifting framework at summary judgment).

4         Ms. Shearer also contends that the court should grant her grant qualified immunity.

5         "[T]he doctrine of qualified immunity protects government officials from liability for civil

6    damages insofar as their conduct does not violate clearly established statutory or constitutional

7    rights of which a reasonable person would have known." *Mattos v. Agarano*, 661 F.3d 433, 440

8    (9th Cir. 2011) (en banc) (cleaned up) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

9    Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an

10   absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mueller v.*

11   *Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

12   "Under qualified immunity, an officer will be protected from suit when he or she 'makes a

13   decision that, even if constitutionally deficient, reasonably misapprehends the law governing the

14   circumstances.'" *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)).

15        "[Q]ualified immunity protects all but the plainly incompetent or those who knowingly violate

16   the law." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017). "The doctrine of qualified immunity

17   gives officials breathing room to make reasonable but mistaken judgments about open legal

18   questions." *Id.* at 1866 (cleaned up). "[I]f a reasonable officer might not have known for certain

19   that the conduct was unlawful[,] then the officer is immune from liability." *Id.* at 1867.

20        In determining whether an official is entitled to qualified immunity, courts consider (1) whether

21   the official violated a constitutional right of the plaintiff and (2) whether that constitutional right

22   was "clearly established in light of the specific context of the case" at the time of the events in

23   question. *Mattos*, 661 F.3d at 440. Courts may exercise their sound discretion in deciding which of

24   these two prongs should be addressed first. *Id.* (citing *Pearson*, 555 U.S. at 235).

25        Regarding the second prong, "clearly established law should not be defined at a high level of

26   generality," but instead "must be particularized to the facts of the case." *White v. Pauly*, 137 S. Ct.

27   548, 552 (2017) (cleaned up). Although case law "does not require a case directly on point for a

28   right to be clearly established, existing precedent must have placed the statutory or constitutional

United States District Court
Northern District of California

1    question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

2        The Ninth Circuit has held that deciding "claims of qualified immunity at the motion-to-dismiss

3    stage raises special problems for legal decision making" because of the tension between the

4    plausibility standard for pleading a claim and the "low bar" for establishing qualified immunity.

5    *Keates v. Koile*, 883 F.3d 1228, 1234 (9th Cir. 2018) (cleaned up). Consequently, at the motion-to-

6    dismiss stage, "[i]f the operative complaint contains even one allegation of a harmful act that would

7    constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go

8    forward with their claims." *Id.* at 1235.

9        Here, the complaint plausibly pleads a First Amendment claim for retaliation, so the court

10    denies Ms. Shearer's argument for qualified immunity at this stage.

11    **4.2  Claim Against Mr. Oskoui**

12        The only allegation about Mr. Oskoui is that he did not respond when the plaintiff emailed him

13    complaining that Ms. Shearer's suspension of him violated his constitutional rights.[50] This is not

14    sufficient: to state a § 1983 claim, the plaintiff must show that a person acting under color of state

15    law committed the conduct at issue. *Leer v. Murphy*, 844 F.2d 628, 632–33 (9th Cir. 1988).

16        If the theory is that he is liable as Ms. Shearer's supervisor, there is no vicarious liability under

17    § 1983. A supervisor may be liable if there is a showing of (1) personal involvement in the

18    constitutional deprivation or (2) a sufficient causal connection between the supervisor's wrongful

19    conduct and the constitutional violation. *Henry A. v. Willden*, 678 F.3d 991, 1003–04 (9th Cir.

20    2012). Even if a supervisory official is not directly involved in the allegedly unconstitutional

21    conduct, "[a] supervisor can be liable in his individual capacity for his own culpable action or

22    inaction in the training, supervision, or control of his subordinates; for his acquiescence in the

23    constitutional deprivation; or for conduct that showed a reckless or callous indifference to the

24    rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (9th Cir. 2011). The claim that a supervisory

25    official "knew of unconstitutional conditions and culpable actions of his subordinates but failed to

26    act amounts to acquiescence in the unconstitutional conduct of his subordinates and is sufficient to

27

28    ────────────

[50] FAC – ECF No. 7 at 27 (¶ 92).

state a claim of supervisory liability." *Keates*, 883 F.3d at 1243 (cleaned up) (conclusory allegations that supervisor promulgated unconstitutional policies and procedures which authorized unconstitutional conduct of subordinates do not state a claim of supervisory liability); *Wilk v. Neven*, 956 F.3d 1143, 1146 (9th Cir. 2020) (a reasonable factfinder could find the warden liable as supervisor in a failure-to-protect suit because only the warden or his designee had the authority to add a person to an inmate's enemy list and there was evidence the plaintiff submitted a request to place an inmate, who later attacked him, on the list).

The allegations about Mr. Oskoui do not plausibly plead a retaliation claim.

### 4.3 City of Belmont

There are no allegations about the City of Belmont either.

Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). The city cannot be held vicariously liable for the unconstitutional acts of its employees under the theory of respondeat superior. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).

To impose *Monell* entity liability under § 1983 for a violation of constitutional rights, a plaintiff must show that (1) the plaintiff possessed a constitutional right and was deprived of that right, (2) the municipality had a policy, (3) the policy amounts to deliberate indifference to the plaintiff's constitutional right, and (4) the policy was the moving force behind the constitutional violation. *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). A *Monell* claim can be based on any of the following theories: (1) a longstanding practice or custom, (2) the failure to adequately train, or (3) a constitutional violation committed or ratified by an official with final policy-making authority. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249–50 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Where a *Monell* claim is based on an allegedly unconstitutional policy, it is sufficient to allege policies that would cause the alleged constitutional violation. *Henderson v. Cnty. of Santa Cruz*,

1    No. 14–cv–03544–RMW, 2015 WL 225429, at *6 (N.D. Cal. Jan. 16, 2015) ("[P]laintiffs have not

2    pleaded sufficient facts to support the existence of such policies, but that evidence is not necessary

3    at the motion to dismiss stage."). To maintain a *Monell* claim based on a failure-to-train theory,

4    "the identified deficiency in a local governmental entity's training program must be closely related

5    to the ultimate injury." *Lee v. City of Los Angeles*, 250 F.3d 668, 681 (9th Cir. 2001) (cleaned up).

6    A policymaker theory requires showing that "final policymaking authority" was delegated to the

7    purported policymaker. *Jessen v. Cnty. of Fresno*, 808 F. App'x 432, 435 (9th Cir. 2020). And a

8    ratification theory requires alleging that the defendant approved the wrongful conduct. *Perryman*

9    *v. City of Pittsburg*, 545 F. Supp. 3d 796, 803 (N.D. Cal. 2021) (citing *Lytle v. Carl*, 382 F.3d 978,

10   987 (9th Cir. 2004)).

11         The plaintiff has not pleaded any facts showing *Monell* liability under any theory.

13   **5.   Expressive Speech — First Amendment and California Constitution (Claims One and Two)**

14         The plaintiff also contends that his environmental-protection volunteerism — all performed in

15   a public park — is expressive speech that is protected by the First Amendment and the California

16   Constitution.[51] The plaintiff pleads only conduct, not protectible symbolic conduct.

17         "The First Amendment protects not only the expression of ideas through printed or spoken

18   words, but also symbolic speech — nonverbal activity . . . sufficiently imbued with elements of

19   communication." *Hightower v. City & Cnty. of San Francisco*, 77 F. Supp. 3d 867, 875 (N.D. Cal.

20   2014) (cleaned up) (quoting *Roulette v. City of Seattle*, 97 F.3d 300, 302–03 (9th Cir. 1996)).

21   Conduct is symbolic speech if two requirements are met: (1) the conduct demonstrates an "intent

22   to convey a particularized message," and (2) there is a "great likelihood that the message would be

23   understood by those who viewed" the conduct. *Id.* at 876 (quoting *Spence v. Washington*, 418 U.S.

24   405, 410–11 (1974)); *accord Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019) (citing

25   *Texas v. Johnson*, 491 U.S. 397, 404 (1989)).

26         *Hightower* in part involved conduct in the form of nude protests, with signs, outside of San

---

[51] FAC – ECF No. 7 at 35 (¶¶ 121–22), 36 (¶ 128).

United States District Court
Northern District of California

1    Francisco City Hall, to challenge a San Francisco ordinance prohibiting public nudity. 77 F. Supp.

2    3d at 872–73, 877. The plaintiffs challenged the ordinance as a violation of their right to engage in

3    expressive political activity while nude. *Id.* at 872. The court held that the plaintiffs' conduct

4    plausibly expressed a particularized message (opposition to the ordinance and support for public

5    nudity) and that a passerby would understand their intended message. *Id.* at 877–78. By contrast,

6    disrobing in the Castro and engaging in nude artistic dance did not plausibly establish a great

7    likelihood that a passerby would understand the plaintiffs' message. *Id.* at 879. This of course was

8    not the end of the court's inquiry: it then analyzed whether the ordinance violated the plaintiffs'

9    protected expressive conduct under the First Amendment. *Id.* at 880 (applying *United States v.*

10   *O'Brien*, 391 U.S. 367 (1968)). That second-level analysis is not relevant here because the

11   plaintiff did not establish that his public volunteerism is intended to be communicative and would

12   be understood by the passerby to be communicative. *Id.* at 876.

13        The conduct is volunteerism to remove invasive species, a matter of public concern.[52] This is

14   not the kind of conduct — public nudity to protest a nudity ordinance, burning a draft card or a flag,

15   silent marches conveying a message, clothing with meaningful symbols (such as antiwar armbands)

16   — that courts find symbolic. Moreover, a passerby would not understand it to be communicative.

17   The plaintiff does not plausibly plead symbolic conduct.

18        The analysis is the same under the California Constitution, art. 1, § 2. The plaintiff pleads only

19   pure conduct, which is not protected under the California Constitution. *Ctr. for Bio-Ethical*

20   *Reform, Inc. v. Irvine Co.*, 37 Cal. App. 5th 97, 114 (2019).

21

22   **6. Declaratory and Injunctive Relief**

23        The defendants move to dismiss the plaintiff's prayer for injunctive relief and a declaratory

24   judgment on the ground that the relief is extraordinary, and the plaintiff has not shown the

25   inadequacy of remedies at law to satisfy the case-or-controversy requirement needed for standing

26

27

28   ────────────────
     [52] Opp'n – ECF No. 35 at 21.

to assert equitable-relief claims.[53] The court denies the preliminary injunction in a separate section below. The court does not foreclose equitable relief now because it cannot assess the adequacy of a remedy at law at the pleadings stage. At the preliminary-injunction hearing, the plaintiff's concern was resuming his project in peak season. The case does not seem to be about money, and it implicates equitable remedies. And declaratory relief is not just about past wrongs: the dispute is ongoing. *United States v. Washington*, 759 F.2d 1353, 1356–57 (1985) (standards that apply to the discretionary decision to grant declaratory relief, including considering the public interest).

### 7. Motion to Strike

The defendants move to strike portions of the complaint — the conduct of mountain bikers, the lack of acknowledgment of his volunteering, and his history of removing plants — as immaterial to his challenge to the suspension of his removal program.[54] The court denies the motion. The allegations at least possibly have a bearing on the retaliation claim. *Oracle Am.*, 817 F. Supp. 2d at 1132; *Rosales*, 882 F. Supp. 2d at 1179. The allegations are not salacious or inflammatory, and removing them would not streamline the case.

### 8. Preliminary Injunction

The court denies the plaintiff's motion for a preliminary injunction because he has not satisfied the *Winter* factors.

First, he has not established a likelihood of success on the merits or, assuming he satisfies the other elements of the *Winter* test, serious questions going to the merits of his federal claim. The issue is not the importance of the work: it is important. But the claim for retaliation survives because to make a prima facie case, the plaintiff needed only to make a minimal showing of retaliation. There is evidence that Ms. Shearer did not retaliate: she denies it and contends that she

---

[53] Mot. – ECF No. 28 at 26–27; FAC – ECF No. 7 at 37 (¶ 129).

[54] Mot. – ECF No. 28 at 27–30.

did it for the other volunteer group too.[55]

Second, the plaintiff frames the harm as (1) his right to be free from retaliation for free speech and (2) "ongoing, irreparable harm."[56] At the hearing, he was concerned with the threat to stopping the appropriate removal of invasive plants at the peak season for removing them.[57] While a delay in removing plants may be harm, it is hard to see how it is irreparable. Ms. Shearer also said that the suspension of the volunteer programs was temporary.[58]

Third, the remaining elements — the balance of equities and whether an injunction is in the public interest — merge where the government is a party. *Azar*, 911 F.3d at 575. The balance of equities is at least neutral on this record and thus does not tip in the plaintiff's favor. On the one hand, his work is important. On the other, so too is the city's interests in managing its property. The same analysis applies to the analysis of the public interest.

The court denies the motion for a preliminary injunction.

## CONCLUSION

The court denies the motion for a preliminary injunction, denies the defendants' motion to dismiss the retaliation claim and the complaint's prayer for declaratory and injunctive relief, and dismisses the other claims with leave to amend if the plaintiff can cure the deficiencies. The plaintiff must file any amended complaint by August 28, 2023, and must attach a blackline comparison of the amended complaint against the current complaint. The court also suggests that the parties try to work out whether the volunteer project can resume.

This disposes of ECF Nos. 22, 28, and 37.

**IT IS SO ORDERED.**

Dated: July 31, 2023

_____
LAUREL BEELER
United States Magistrate Judge

---

[55] *See supra* Statement.

[56] Mot. – ECF No. 22 at 35. The court includes only the retaliation claim and eliminates the other claims.

[57] *Id.* at 10 (framing the issue this way).

[58] Shearer Decl. – ECF No. 30-1 at 4 (¶ 12).